UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
**Derrick Jackson,**

                        **Plaintiff,**

       -against-

**Andrew Saul**, *Acting Comm'r of Social Security*,

                        **Defendant.**
------------------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __3/31/2022__

**1:20-CV-4638-ALC**

<u>**OPINION AND ORDER**</u>

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Derrick Jackson ("Plaintiff" or "Jackson") brings this action challenging the Commissioner of Social Security's ("Commissioner" or "Defendant") final decision that Plaintiff was not disabled, denying him Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act. Before the Court is Plaintiff's motion for summary judgment under Rule 56 and Defendant's cross-motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Upon review of the submissions and for the reasons stated below, Plaintiff's motion is **DENIED**, and Defendant's motion is **GRANTED**.

<u>**BACKGROUND**</u>

**I. Procedural History**

On September 26, 2017, Jackson filed a Title II application for disability benefits, alleging disability starting August 12, 2015. (R. at 10). The alleged impairments were limitations of the left ankle and right wrist. (R. at 65). Born May 10, 1966, Jackson was 49 years old on the date he filed the application. (R. at 58). The Social Security Administration initially denied Jackson's claim on November 22, 2017. (R. at 73). Jackson subsequently requested a hearing on November 27, 2017. (R. at 10). On February 27, 2019, a hearing was held before the

1

Administrative Law Judge ("ALJ") Sharda Singh. Represented by counsel, Jackson appeared and testified at the hearing. (R. at 32). Vocational Expert ("VE") Marian R. Marracco testified. (R. at 10). The ALJ denied Jackson's application on May 1, 2019 (R. at 7), and the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner on his Title II application for disability benefits. (R. at 1-5).

    Jackson commenced the instant lawsuit in the Southern District of New York on June 17, 2020, following the denial of his request for review. Compl., ECF No. 1. On April 5, 2021, Jackson moved for summary judgment pursuant to Fed. R. Civ. P. 56(a). *See* Plaintiff's Motion ("Pl.'s Mot."), ECF No. 14-15. Defendant filed a cross-motion for judgment on the pleadings pursuant to Rule 12(c) on June 4, 2021. *See* Defendant's Motion ("Def.'s Mot."), ECF No. 16, 17. Jackson responded to Defendant's cross-motion on June 22, 2021, which indicated that Plaintiff would rest on his initial motion papers. *See* Plaintiff's Response ("Pl.'s Resp."), ECF No. 18.

## II. Non-Medical Evidence

### B. ALJ Hearing

    1. *Plaintiff's Testimony*

    On February 27, 2019, Mr. Jackson, represented by counsel, testified before the ALJ. (R. at 32). Mr. Jackson was 54 years old at the time. (R. 34). His highest level of education was three years of college, and he resided with his wife and two children. (*Id.*). At the time, he was not working, could only prepare microwaved meals, refrained from sitting for more than 20 minutes, and could not walk more than a block due to his pain. (R. 35, 37). However, he could attend to his own personal needs, including getting dressed, bathing/showering, and grooming. (R. at 42). He was able to drive to go shopping and to take his daughter to school approximately

two to three times a week. (R. at 42). Additionally, due to his sleep apnea and inability to exercise, he had gained roughly 10 to 15 pounds (R. at 38).

Because he lived in a two-story home, Jackson refrained from sleeping in his second-floor bedroom and instead slept on the first floor in the living room. (R. at 39). He could not lift more weight than a gallon of milk and had refrained from attending social activities for the previous three years. (R. at 41). Because he refrained from climbing up and down stairs, his wife handled tasks such as cooking, cleaning, and doing laundry. (R. at 44). He saw Dr. Kushner, participated in physical therapy, and took his prescribed medication, which aided in the recovery of his left ankle pain. (R. 44-45). However, the denial of his workers' compensation cut off his physical therapy sessions on or about the prior spring/summer. (R. at 45). Lastly, he testified that he had received a cortisone shot during the prior year for his right wrist pain. (R. at 49). Surgery was suggested by Dr. Abernatti, but Mr. Jackson declined surgery due to his uneasiness about going under the knife. (R. at 49). To ease the pain, he wears a wrist brace approximately four hours a day. (R. at 49-50).

    2. *Marian R. Marracco – Vocational Expert*

VE Marian R. Marracco examined a situation in which an individual would have similar conditions as Mr. Jackson and testified to the likelihood of employment. (R. at 51-55). Ms. Marracco testified that his past work as a Corrections Officer, DOT 372.667-018, required a medium exertion level, with occasions in which the exertion level may escalate to heavy exertion levels. (R. at 51). Ms. Marracco concluded that an individual with all the conditions Mr. Jackson possessed would be unable to perform part-time work as a corrections officer. (R. at 52). She based her assessment on an individual who was limited to a light exertion level, which included the sit/stand option after half an hour, with needing the option to sit down for one to two minutes

while remaining on task; no climbing of ladders, ropes, or scaffolds; occasionally climbing of ramps or stairs; kneeling, crouching, and crawling but limited to fine and gross hand manipulations with the right, non-dominant hand; and the avoidance of hazards such as moving machinery. (R. at 51-52). Ms. Marracco also testified that there are other jobs in the national economy that he could seek, including gate guard, security guard, or patrol conductor. (R. at 52-53). The skills required by said position were deemed transferrable from his past work experience. (R. at 52). However, he would need to take unscheduled breaks outside of the breaks normally taken during a typical eight-hour workday, resulting in the individual being off-task for more than 15 percent of the workday. (R. at 54). Ms. Marracco clarified, following an inquiry from Jackson's counsel regarding the work activities of a patrol conductor, that the claimant's limitation of sit/stand every twenty minutes could impose a difficulty on the individual if the job required a trip to a correctional facility or the courthouse (which would conceivably exceed 20 minutes). (R. at 55).

    3. *Disability Reports*

On September 27, 2017, Jackson completed a disability report that listed multiple joint arthritis, right wrist impairment, left ankle impairment, and high cholesterol as his medical conditions. R. at 187. He reported that he had not worked since January 12, 2013 because of these conditions. R. at 187. He worked as a corrections officer for the prior 15 years. R. at 188. Jackson had seen a doctor or health care professional or received treatment, and planned to do so in the future, in connection with his physical conditions. R. at 187. On December 6, 2017, he completed another disability report that was substantially similar, but it noted that his wrist pain had gotten worse on or about fall 2017. R. at 205.

    4. *Function Report*

Plaintiff completed a function report on October 25, 2017. (R. 194). He reported that he could prepare simple meals such as sandwiches, salads, and microwaveable meals about two to three times per week. (R. at 195). When he did not cook, other family members would cook and prepare his meals for him. (R. at 195). He did not do housework and yardwork because his children would do light cleaning within the house, and he had hired a landscaper for outdoor maintenance. (R. at 195). His hobbies were now sedentary, and he had refrained from participating in his past hobbies of playing sports, working out, and DJ-ing. (R. at 196). Due to his pain, he was incapable of standing for long periods of time, could not walk longer than 30 minutes, and was unable to lift heavy items. (R. at 197). Jackson had no problems with personal care and could walk up to three blocks or walk up to 10 minutes continuously using his brace and compression socks. R. at 200.

### III. Medical Treatment/Evidence

On December 3, 2007, Jackson went to The Center of Orthopedic Specialties at Montefiore, he was seen by orthopedic surgeon, Dr. Roy G. Kulick ("Dr. Kulick") (R. at 279). Dr. Kulick administered a physical examination of Jackson's right wrist. The reason for the visit was a follow-up regarding the incident that occurred on October 11, 2007. On said date, Jackson was on duty as a correction officer and in an altercation with an inmate, during which he injured his right wrist. (R. at 279). Additionally, Jackson stated in or about 2013, he suffered from another fall that injured his wrist and possibly fractured it but received no treatment. (R. at 279). Dr. Kulick's examination report noted that Jackson had a cyst formation on his right wrist, that surgery was required to remove the cyst, and that the cyst formation could be considered aggravation of a preexisting condition. (R. at 279).

On September 8, 2008, Jackson visited Dr. Kulick for a scheduled loss evaluation. (R. at 284) Jackson decided not to have the surgery for his right wrist nonunion of the scaphoid. (*Id.*) Upon physical examination, the recommended loss of the right hand was 27.5%. (*Id.*)

On January 12, 2013, Jackson suffered another work incident in which he fell and injured his left ankle while descending wet stairs. (R. at 285). He was taken to the Albert Einstein Emergency Room and under examination by, diagnostic radiology specialist, Dr. Joseph Divito, a left ankle dislocation was discovered. (R. at 447-448). On January 13, 2013, he was discharged from the ER and orthopedic surgeon, Dr. Konrad Gruson, prescribed Percocet and Aspirin for his pain. (R. at 527-529). Radiologist, Dr. Shlomit Goldberg-Stein, examined his left ankle and found no evidence of a fracture but rather degenerative osteophytes and Achilles insertional enthesopathy and a Plantar Calcaneal Spur. (R. at 445-46).

On January 22, 2013, Dr. Chalyaporn Kulsakdinun ("Dr. Kulsak") conducted a pre-operation evaluation related to surgery of the left ankle, which was scheduled for January 31, 2013. (R. 356-334). Upon a satisfactory pre-operation evaluation, the surgery of an Open Reduction Internal Fixation of the Left Trimalleolar Ankle Fracture occurred. (R. at 353-355). Dr. Kulsak conducted a post-operation evaluation on February 1, 2013. (R. at 392-394).

On April 11, 2013, Dr. Arnold Berman, an orthopedic surgeon, performed an independent medical examination on the request of JEC Disability Management, in which Jackson reported that he had no prior similar injuries to his left ankle, but that he had arthritis of the right wrist. (R. at 341-344). Additionally, Dr. Berman's examination found reduced left ankle range of motion ranging from 10 to 20 degrees. (R. at 343).

Through the following months, Jackson reported to Dr. Kulsak for general examinations regarding his left ankle: 1/18/13 (R. at 421-425); 2/15/13 (R. at 418-420); 3/12/13 (R. at 415-

6

417); 4/23/13 (R. at 412-414); 6/5/13 (R. at 408-409); 10/29/13 (R. at 728-730). Jackson continued to state a pain in his left region, although he stated that his left leg pain was decreasing on February 15, 2013 (R. at 418). Jackson started to complain about left ankle swelling on April 23, 2013 and continued to do so on June 5, 2013. (R. at 411, 426).

Additionally, Jackson also reported to orthopedist, Dr. Michael Cushner ( "Dr. Cushner") regarding his left ankle as a general examination/follow-up: 4/18/13 (R. at 743-745); 5/16/13 (R. at 746-747 ); 6/23/13 (R. at 753-754); 8/14/13 (R. at 756-757); 9/21/13 (R. at 762); 10/26/13 (R. at 764-765); 12/6/13 (R. at 336); 2/2/14 (R. at 346); 3/18/14 (R. at 774-775). During these follow-ups, Jackson continued to state pain in his left leg region. Dr. Cushner continued to prescribe Naprosyn and Voltaren gel for the pain, along with physical therapy. (R. 743-775). On April 3, 2014, orthopedic surgeon, Dr. Alexios Apazidis, provided an Independent Orthopedic Examination with a detailed report of the January 12, 2013 incident. (R. at 337). Dr. Apazidis provided a review of Jackson's Medical Records. In Dr. Apazidis' examination he states that Jackson's left ankle does not have a normal range of motion. Rather, Jackson range of motion varies from 10-20 degrees below would be deemed a normal range of motion. (R. at 339). Dr. Apazidis stated that Jackson's Schedule Loss of Use is 40% regarding his left ankle. (R. at 339).

Jackson returned to Dr. Cushner on March 13, 2016 and reported increased pain in his left ankle and a new pain along the anterior portion of his left ankle. (R. 291) The physical examination administered showed Jackson's range of motion had not worsened nor improved since his examination with Dr. Apazidis in 2014. (*See id.*)

On his follow-up with Dr. Cushner on July 28, 2017, tenderness was noticed and limited hindfoot and midfoot motion of the left ankle were identified. (R. at 296). On August 4, 2017,

Jackson reported a pain on his right wrist. (R. at 301). Dr. Cushner prescribed Naprosyn and Voltaren gel to be used for the pain and referred Jackson to a hand specialist. At that time, Jackson's range of motion was deemed normal. (R. at 302). On July 31, 2017, an x-ray was performed on Jackson's right wrist and demonstrated a chronic scaphold fracture and a scapholunate advanced collapse (SLAC) of the wrist. (R. at 522).

On August 21, 2017, Dr. Cushner wrote a Progress Report ranging from June 21, 2017-August 21, 2017. (R. at 301). The report stated that Jackson had 100% temporary impairment of his left ankle which was a result from his previous incidents as a correctional officer. (R. at 304). At no point did Dr. Cushner state an opinion whether Jackson should or could return to work given that Jackson was retired. (*Id*.). On August 28, 2017, Dr. Kushner reiterated Jackson's temporary impairment in his Initial Report. (R. at 510-513).

On September 20, 2017, Jackson visited Dr. Cushner regarding his right wrist injury resulting from the October 11, 2007 incident. (R. at 270). Jackson wanted to reopen his worker's compensation case and reported that his right wrist pain never got better. (R. at 270-276) Dr. Cushner referred Jackson to a hand specialist. (R. at 276). On September 27, 2017, Jackson visited Dr. Lawrence Gold of the WESTMED Medical Group. (R. at 277). Dr. Gold took imaging of his wrist and the results indicated a degenerative change of the radiocarpal joint and an effusion within the radiocarpal joint and midcarpal joint. (R. at 277). On the same day, plastic surgeon, Dr. Brenon Abernathie, reviewed the x-rays with Jackson and indicated surgery was necessary given that no conservative measures would improve the pain. (R. at 450-451).

On October 4, 2017, on a follow-up with Dr. Cushner, Jackson reported increased pain in his right wrist. (R. at 456). Dr. Cushner recommended restarting physical therapy, taking Naprosyn, and using a TheraBand. (R. 456-459). On a scheduled follow-up on October 25, 2017,

Dr. Cushner continued Jackson's prescription of Naprosyn and Voltaren Gel and was still waiting on approval for Physical Therapy. (R. at 507-509). Dr. Cushner later wrote a Progress Report on November 3, 2017, of the examination held on October 25, 2017.(R. at 505). Dr. Cushner stated Jackson still had temporary impairment of 100% of his right wrist. (R. at 506). Additionally, recommendations regarding work capabilities were not referenced due to Jackson being retired. (R. at 505-506). Dr. Abernathie issued a Progress Report on December 5, 2017 for an examination of Jackson that took place on November 22, 2017. (R. at 493). The report restated Jackson's right wrist pain and fracture of the navicular bone with no additional recommendations. (R. at 493-494).

Jackson attended Burke Rehabilitation and Research at the Yonkers location for his left ankle strain on the following dates: 1/31/18 (R. at 786-790); 2/2/18 (R. at 791-793); 2/8/18 (R. at 793-794); 2/9/18 (R. at 795-796); 2/12/18 (R. at 797-798); 2/14/18 (R. at 799-800); 2/15/18 (R. at 804-805); 2/19/18 (R. at 806-807); 2/21/18 (R. at 809-810); 2/22/18 (R. at 811-812); 3/6/18 (R. at 813-817). Jackson did therapeutic procedure exercises and had manual therapy to alleviate the pain in his left ankle, however, Jackson still suffered from pain. (R. at 786-817). All of Jackson's physical therapy plans were administered and signed by Dr. Reena Chalunkal. (R. at 786-817).

Throughout Jackson's physical therapy sessions, he continued to see Dr. Cushner for follow-ups regarding his right wrist and left ankle pain. Dr. Cushner continued to prescribe Voltaren Gel to Jackson and recommended at-home exercises and stretches to alleviate discomfort. (6/11/18, R. at 825-829; 11/19/18 (R. at 830-834); 12/31/18 (R. at 854-856).

In addition to Jackson's continued pain and discomfort of his right wrist and left ankle, he was also being treated for sleep apnea by Dr. Rajendra Rampersaud ("Dr. Rajendra"). Jackson

9

saw Dr. Rajendra on the following dates: 6/26/18 (R. at 846-847); 8/30/18 (R. at 848-849); 11/29/18 (R. at 850-851). During his last session on November 29, 2018, Dr. Rajendra stated that Jackson was advised on treatment benefits and recommended to continue PAP therapy. (R. at 850-851).

## LEGAL STANDARD

### I. Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §405(g) and 1383(c)(3) to determined whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2.d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mine might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (internal quotation marks omitted). In other words, this Court must afford the Commissioner's determination considerable deference and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a difference result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted).

### II. Commissioner's Determination of Disability

**A. Definition of Disability**

A disability, under the Social Security Act, is defined as one that renders a person unable to "engaged in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." U.S.C. §423(d)(1)(A); *accord* 42 U.S.C. §1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Shaw v. Charter*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. §423(d)(2)(A)).

**B. The Commissioner's Five-Step Analysis of Disability Claims**

The Commissioner must use a five-step process in order to determine whether a claimant has a disability under the Social Security Act. 20 C.F.R. § 404.1520(a)(4). The Commissioner must first determine whether the claimant is currently engaged in substantial gainful activity. *Id.* §404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, then the claimant is not disabled. *Id.* If the claimant has not engaged in substantial gainful activity, then the Commissioner will proceed to the next step. The Commissioner must then consider whether the claimant has a "severe medically determinable physical or mental impairment" or a combination of impairments which meet the duration requirements of a continuous period of 12 months. *Id*. § 404.1520(a)(4)(ii); *see also id.* §404.1509 (establishing duration requirement). If the claimant suffers from such an impairment, the Commissioner then determines whether the impairment(s) meet or are medically equally to the criteria of the listed impairment in Appendix 1 of the Social Security Act regulations. *Id.* §404.1520(a)(4)(iii); *see also id.* §Pt. 404, Subpt. P, App'x 1. If the

11

claimant does not have a listed impairment(s), the following inquiry would be if despite the claimant's impairment(s), does the claimant have the residual functional capacity ("RFC") to perform their past work. *Id.* §404.1520(a)(4)(iv). Lastly, if the claimant is unable to perform his past work, the Commissioner must determine whether there is other work of which the claimant could perform. *Id.* §404.1520(a)(4)(v).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). However, in the last step, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhard*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. §404.1560), *amended on reh'g*, 416 F.3d 101 (2d Cir. 2005); *see also* 20 C.F.R. §404.1520(a)(4)(v).

**C. The ALJ's Decision**

First, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since August 12, 2015, the alleged onset date of disability. (R. at 12-13)

Second, the ALJ concluded that Plaintiff had the following severe impairments: obstructive sleep apnea, left ankle fracture with open reduction and internal fixation and right ankle strain, obesity, and right wrist fracture. (*Id.*)

Third, the ALJ determined that Plaintiff's impairments, alone or in combination, did not meet the medical equivalent to the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1 (the "Listings"). (*Id.*)

Fourth, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §416.967(b), except that he required the option to sit/stand every 20-30 minutes while remaining on task and could never climb ladders, ropes, or scaffolds. (R. at 13). Additionally, the ALJ concluded that Plaintiff had frequently gross hand manipulation with the right non-dominant hand. (*Id.*)

Fifth, the ALJ concluded that Plaintiff was unable to perform past relevant work as a Corrections Officer. (*Id.*)

Sixth, the ALJ considered Plaintiff's age, educational and vocational background, RFC, VE testimony, and the Medical-Vocational Guidelines 204.00, set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2. (*Id.*). The ALJ concluded that with adjustments, there are a substantial amount of available jobs Plaintiff can acquire and perform. (R. at 17). The ALJ therefore found that Plaintiff was not disabled within the meaning of the Act. (*Id.*).

## ANALYSIS

### I. The ALJ's RFC Determination Is Supported by Substantial Evidence

In essence, Jackson's motion argues that the ALJ made an erroneous RFC determination: that Plaintiff could perform light work with some limitations. He asserts that the ALJ erred by failing (1) to give more weight to his personal testimony about the intensity and persistence of his symptoms over other record evidence and (2) by failing to order a consultative examination from a treating source opining on restrictions on daily living or RFC. Upon careful review of the record and the Parties' motions, the Court concludes that the ALJ did not commit error. The ALJ's decision on Plaintiff's RFC was supported by substantial evidence because the ALJ properly evaluated the intensity and persistence of the alleged symptoms, and no supplemental consultative examination was warranted.

**A. Intensity and Persistence**

The subjective element of pain is an important factor to be considered when determining disability. An ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment . . . in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) (internal citation omitted). The intensity and persistence of the claimant's symptoms must be evaluated based on all the available evidence. *See* 20 C.F.R. §§ 404.1529(a)-(c), 416.929(a)-(c). Additionally, if an individual alleges impairment-related symptoms, ALJs must:

> First . . . consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, . . . evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.

SSR 16-3p (S.S.A.), 2016 WL 1119029 (hereinafter, "SSR 16-3p"). SSR 16-3p clarifies that:

> The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities . . .

In evaluating the "intensity, persistence, and limiting effects of an individual's symptoms," ALJs will rely on the factors set forth in 20 CFR §§ 404.1529(c)(3) and 416.929(c)(3), which include:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the

>type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p. However, ALJs are only required to discuss factors that are "pertinent to the evidence of record." *Id.*

The ALJ properly evaluated the intensity and persistence of symptoms in determining that claimant's statements were "not entirely consistent with the medical evidence and other evidence in the record." (R. at 12). The ALJ concluded that Jackson's physical impairments "could reasonably be expected to cause the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*).

After evaluating each of Plaintiff's physical impairments, the ALJ concluded that he was "capable of performing less than the full range of light work as defined in 20 CFR 404.1567(b)." (*Id.*). In particular, the ALJ relied on medical records that reflected that Plaintiff had been diagnosed with obstructive sleep apnea from February 7, 2017 and prescribed a trial of AutoPAP for treatment. (*Id.*). Regarding his wrist and ankle injuries, the ALJ looked to the results of treating source Dr. Micheaelis' musculoskeletal examination, which revealed no abnormalities. (*Id.*). An X-ray of the right wrist showed some abnormality, but objective examination revealed that he had "near full range of motion" and only "some soreness." (*Id.*) (quoting treatment notes). Records also demonstrated that ganglion on the right wrist was likely due to Plaintiff working out some time in 2017. (*Id.*) Moreover, treating source Dr. Cushner restarted Plaintiff on physical

therapy for his ankle after he declined surgery, by choice, citing his "current functionality." (*Id.*). That Plaintiff declined to get recommended surgery on his ankle would points toward a reduced intensity and persistence of his ankle problem. Examining his treatment history for 2018, the ALJ noted that the treatment regimen "ha[d] been generally successful in controlling the claimant's symptoms" but nevertheless reduced Plaintiff's functioning to "less than a full range of light work with manipulative and postural limitations" in light of his musculoskeletal comorbidities. (*Id.*). The ALJ also considered the effect of Plaintiff's alleged obesity, even though Plaintiff had not asserted obesity as an impairment, in accordance with SSR 02-1p. (*Id.*). All this evidence was accounted for in the RFC. (*Id.*). Notably, the ALJ did not pinpoint any gaps or discrepancies in the record warranting a consultative examination to supplement the record.

The ALJ determined that certain medical opinions and prior administrative findings did not hold "controlling weight." (R. at 12-13). The ALJ specifically determined that the November 22, 2017 medical opinion by Dr. Saeed asserting that Plaintiff was capable of full range of light work was "persuasive" in its adequate accounting of "claimant's subjective complaints with specific references to evidence;" however, the ALJ gave the opinion less weight because medical evidence produced after submission of his opinion demonstrated "deeper limitations." (R. at 13).

Furthermore, the ALJ specifically rejected Plaintiff's subjective complaints about pain as they were inconsistent "with the medical signs, laboratory findings and/or other evidence of record which limit the capacity for work-related activities." (R. at 13). The ALJ offered four reasons for this position: (1) Plaintiff's daily activities were inconsistent with his "complaints of disabling symptoms and limitations," (2) his treatment regimen for pain had been "essentially routine and/or conservative in nature" and "would not prevent the claimant from engaging" in

the determined RFC, (3) "the record d[id] not contain any non-conclusory opinions, supported by clinical or laboratory evidence, from treating or examining physicians indicating that the claimant [was] currently disabled," and (4) "claimant's symptoms and related limitations [were] not consistent with the evidence of record." (R. at 13). Ultimately, the ALJ concluded that the totality of the medical evidence revealed that "the claimant [was] not as limited as is alleged." (R. at 13).

**B. ALJ's Discretion to Supplement the Record with a Consultative Examination**

An ALJ has discretion to order a consultative examination at the expense of the agency where a Plaintiff's "medical sources" do not provide "sufficient medical evidence" to decide on a disability claim. 20 C.F.R. §404.1517. ALJs will typically "not request a consultative examination" in a case until they "have made every reasonable effort to obtain evidence" from Plaintiff's medical sources. 20 C.F.R. §404.1512(b)(2). For example, an ALJ "may order a consultative examination while awaiting receipt of medical source evidence in some instances, such as when" the ALJ know[s] a source is not productive, is uncooperative, or is unable to provide certain tests and procedures." *Id.*

Before ordering a consultative examination, an ALJ "will consider not only existing medical reports, but also the disability interview form containing [the Plaintiff's] allegations as well as other pertinent evidence." 20 C.F.R. §404.1519a(a). Situations that may require a consultative examination are when an ALJ needs "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision" regarding disability. 20 C.F.R. §404.1519a(b). "An ALJ is not obligated to send a litigant for a consultative examination if the facts do not warrant or suggest

17

the need for such an examination." *Serianni v. Astrue*, 2010 WL 786305, *5 (N.D.N.Y. Mar. 1, 2010) (citation omitted).

In formulating the RFC determination, the ALJ did not identify any gaps or inconsistencies in the record, and Plaintiff "offers no legal basis for [his] argument that" a consultative "examination was either required or necessary." *Yancey v. Apfel*, 145 F.3d 106, 114 (2d Cir. 1998)*.* As discussed *supra*, there was substantial medical evidence in the record to support the RFC determination that Jackson could engage in light work with very narrowly tailored limitations articulated by the ALJ. "The ALJ was not obligated to order new consultative examinations where there was no evidence to suggest that [Jackson's] condition had deteriorated following the . . . date of disability onset." *Prince v. Astrue*, 490 Fed.Appx. 399, 400-01 (2d Cir. 2013) (summary order). Upon reviewing the record, the Court cannot identify any inconsistency or gap in the record that would warrant ordering an additional consultative examination from a treating source. In fact, the record does not reflect that Plaintiff himself ever pinpointed a gap or inconsistency that would warrant a consultative examination from a treating source during the administrative proceedings. Furthermore, given that observations and examinations from treating sources Dr. Micheaelis and Dr. Cushner revealed little to no abnormality in Plaintiff's functioning, it is highly unlikely that a consultative examination from them would have altered the ALJ's conclusion.

Having considered the totality of evidence in the record, the Court holds that the ALJ's determination that Plaintiff is not disabled and has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with some limitations is supported by substantial evidence.

## **CONCLUSION**

For the reasons explained above, Plaintiff's motion for judgment on the pleadings is **DENIED**, and Defendant's cross-motion is **GRANTED**. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

**Dated: March 31, 2022**
  New York, New York

　　　　　　　　　　　　　　　　　　　　　**ANDREW L. CARTER, JR.**
　　　　　　　　　　　　　　　　　　　　　**United States District Judge**